Robert A. DICKERSON, Appellant,

v.

**COMMONWEALTH of Kentucky,**
**Appellee.**

No. 2003–SC–0543–MR, 2003–SC–0833–TG, 2003–SC–0834–TG.

Supreme Court of Kentucky.

Oct. 20, 2005.

**1.** *Nucor Corp. v. General Electric Co.*, 812 S.W.2d 136, 141 (Ky.1991).

**2.** *Id.* at 141.

**3.** *Id.*

**4.** *Reliable Mechanical, Inc. v. Naylor Industrial Services, Inc.*, 125 S.W.3d 856, 858 (Ky. App.2003).

Gail Robinson, Assistant Public Advocate, Department of Public Advocacy, Frankfort, Counsel for Appellant (2003–SC–0543–MR and 2003–SC–0833–TG).

Gail Robinson, Assistant Public Advocate, Department of Public Advocacy, Frankfort, Michael Robert Rivers, Paducah, Counsel for Appellant (2003–SC–0834–TG).

Gregory D. Stumbo, Attorney General, Tami Allen Stetler, Assistant Attorney General, Criminal Appellate Division, Frankfort, Counsel for Appellee (2003–SC–0543–MR, 2003–SC–0833–TG and 2003–SC–0834–TG).

Opinion of the Court by Justice COOPER.

This appeal involves three separate indictments rendered by Fulton County grand juries against Appellant, Robert Dickerson, and three jury trials in the

Fulton Circuit Court on those charges. Appellant was represented by a different public defender at each trial. He was ultimately convicted of one count of sodomy in the first degree ("sodomy 1st"), a Class B felony (which should have been a Class A felony since the jury found that the victim was less than twelve years of age), KRS 510.070(2), for which he was sentenced to confinement in the penitentiary for twenty years, subsequently enhanced to thirty years because the jury found him to be a persistent felony offender in the second degree (PFO 2nd), KRS 532.080(2); one count of possession of a handgun by a convicted felon, a Class C felony, KRS 527.040(2), for which he was sentenced to ten years in prison; and one count of violating the Sex Offender Registration Act by failing to notify the Division of Probation and Parole of his change of address, KRS 17.510(10)(b), presently classified as a Class D felony, KRS 17.510(11), for which he was sentenced to five years in prison.

(In fact, the grand jury indicted Appellant twice for violating KRS 17.510(10)(b). Indictment number 01–CR–00088, the indictment that is the subject of this appeal, alleged a violation date of June 27, 2001; indictment number 02–CR–00122, the indictment under which Appellant was tried and convicted, originally alleged a violation date of May 23, 2002. Appellant was incarcerated in the Fulton County Jail from the date of his arrest, January 24, 2001, until at least July 10, 2003, when he was finally sentenced on the sodomy 1st conviction, a period encompassing both June 27, 2001, and May 23, 2002.)

The trial court ordered all of the sentences to run concurrently for a total of thirty years. Appellant appealed the conviction and sentence for sodomy 1st, enhanced by PFO 2nd, 01–CR–00015, to this Court as a matter of right. Ky. Const.

§ 110(2)(b). He appealed the handgun and sex offender registry convictions and sentences, 01–CR–00015 and 01–CR–00088, to the Court of Appeals as a matter of right. Ky. Const. § 115. We subsequently granted transfer of those appeals, CR 74.02, and consolidated them with the appeal of the sodomy 1st and PFO 2nd convictions.

## I. FACTS.

Appellant was twice previously convicted of sexual offenses in the Jefferson Circuit Court. In May 1988, Appellant was indicted on one count of rape in the first degree ("rape 1st") by forcible compulsion; two counts of sodomy 1st, one premised upon forcible compulsion and the other premised upon the victim being less than twelve years of age; and one count of sexual abuse in the first degree ("sexual abuse 1st"), premised upon the victim being less than twelve years of age. All of the offenses were allegedly perpetrated against the same victim, "L.A." Pursuant to a plea agreement consummated on May 31, 1989, Appellant was convicted of one count of sodomy in the second degree ("sodomy 2nd"), a Class C felony premised upon the victim being between twelve and fourteen years of age or mentally incapacitated, KRS 510.080; and one count of sexual abuse 1st. He was sentenced to five years for sodomy 2nd and to one year for sexual abuse 1st, with the sentences to be served concurrently, but probated for five years.

In 1995, Appellant was indicted by a Jefferson County grand jury on three counts of sodomy 1st, two counts of rape 1st, and PFO 2nd, all perpetrated against the same victim, "C.B." One of the 1995 sodomy charges was premised upon the victim being less than twelve years of age. The remaining charges were all premised upon forcible compulsion. Pursuant to a plea agreement consummated on Novem-

ber 28, 1995, Appellant pled guilty to three amended charges of sexual abuse 1st and was sentenced to serve four years on each count, with the sentences to run concurrently. Appellant "served out" this sentence and was released on August 1, 1997.

On July 17, 1997, pursuant to KRS 17.510(2), a provision of the Sex Offender Registration Act, Appellant executed a pre-release sex offender register entry form on which he indicated that his post-release address would be 2409 24th Ave. North, Nashville, Tennessee. The form contained the following notice:

> I have been notified that the above information is being sent to the Kentucky State Police in order to place me on the sex offender register. I also understand that if I should have a change of address, I am required to notify the local probation and parole officer within fourteen days. I further understand that my failure to comply with this law is a Class A misdemeanor.

Upon his release, Appellant did not move to Nashville, Tennessee, but to Fulton, Kentucky. Renee Grogan testified at the trial of the sexual offense registration charge that she met Appellant at the bus station in Paducah in early August 1997 and drove him to Fulton. She also testified that she and Jawan Ghoulson accompanied Appellant to the Hickman office of Lawrence Mitchell, the probation and parole officer for Fulton County. Ghoulson verified that he accompanied Grogan and Appellant to Mitchell's office. Appellant asserted that since he had "served out" his sentence, he was under no obligation to report to a parole officer except to register his new address. He testified that he told Mitchell that he was a sex offender registrant and gave Mitchell his name, social security number, date of birth, and new address. We are not required here to determine whether that satisfied his duty

to "register" his new address; but if it did, it was then Mitchell's responsibility to forward the information to the Information Services Center at Kentucky State Police Headquarters in Frankfort, not, *e.g.*, to the Department of Corrections (Mitchell's employer). The information Appellant alleges he gave to Mitchell is not on file at the Information Services Center. Mitchell did not testify and the record does not reflect whether he is still an employee of the Department of Corrections.

Crystal Crumble and her three children, including her ten-year-old daughter, A.H., began residing at Appellant's residence at 908 Maiden Street, Fulton, Kentucky, sometime during the summer of 2000. Appellant and Crumble married in December 2000. Appellant worked the night shift at a local factory, and Crumble worked a day shift. On Sunday night, January 21, 2001, A.H. told Crumble that while Crumble was at work on the morning of January 20, 2001, Appellant showed A.H. a brown-and-black-colored handgun and threatened to kill her and everyone in the house if she did not do as she was told. Appellant then took A.H. into her bedroom, told her to remove her underwear, licked her "privates," then turned her over and leaned his "middle spot" against her "behind," at which time she felt something runny and soft. Appellant then told A.H. that "it was over" and gave her a yellow wash rag with which to clean herself. A.H. claimed she hung the wash rag "on a railing" and put her underwear "in the dirty clothes." Crumble immediately notified the Fulton Police Department, which instituted a criminal investigation. The underwear A.H. was wearing at the time of the offense and the yellow wash rag were never found. Forensic testing of A.H.'s bed sheets and the clothing she was wearing at the time of the alleged offense tested negative for semen or any other bodily fluids.

Appellant did not come home from work after his Sunday night shift on January 21, 2001. Instead, he rented a motel room in Mayfield, Kentucky. He made a telephone call to his mother-in-law, who used her telephone's "caller ID" function to identify the telephone number from which the call was made. The police traced the number to the Mayfield motel and arrested Appellant on January 24, 2001. Prior to his arrest, Appellant had overdosed himself with medication in a claimed suicide attempt. Appellant did not specifically confess to the sodomy but told Fulton Police Captain (now city manager) John Ward that "I did what they say I did." The police took Appellant to a hospital for treatment of the overdose, and then lodged him in the Fulton County Jail, where he remained until at least July 10, 2003.

On March 8, 2001, a Fulton County grand jury rendered indictment number 01–CR–00015, charging Appellant with sodomy 1st, possession of a "handgun" (but not a "firearm") by a convicted felon, and PFO 1st. Sometime in 2001, Kentucky State Police Lieutenant Brad Bates, Commander of the Records Branch, which includes the Information Services Center, received a "tip" from the "coordinator" of the Department of Corrections that Appellant was residing in Fulton. (It is unknown whether, as Appellant suggests, the tip was based on the information Appellant claims to have provided to Leonard Mitchell in 1997, whether it resulted from Appellant's incarceration in January 2001, or neither.) Bates then obtained information from the Fulton Circuit Clerk that a driver's license had been issued to Appellant on August 10, 2000, reflecting Appellant's 908 Maiden Street address. On August 14, 2001, Bates mailed a "Warning of Non-Compliance" to Appellant at the 908 Maiden Street address, threatening prosecution if Appellant did not report his new address to the Division of Probation and Parole.

Of course, Appellant was then residing at the Fulton County Jail. On September 19, 2001, Appellant was formally "arrested" at the jail for "failure to comply with sex offender registry." Indictment number 01–CR–00088 was rendered on September 27, 2001, charging Appellant with violating the Sex Offender Registry Act on June 27, 2001. The indictment did not charge Appellant as a PFO. The record does not reflect the significance of the date of June 27, 2001. As noted, Appellant had been incarcerated in the Fulton County Jail since January 24, 2001.

On November 8, 2001, Julie Thomas, a probation and parole officer for Fulton County, visited Appellant at the jail and prepared a new registry form listing Appellant's present address as the Fulton County Jail, Hickman, Kentucky, and reflecting that his expected address upon release would be 908 Maiden Street, Fulton, Kentucky. That form contains the following notice:

> I have been notified that the above information is being sent to the Kentucky State Police in order to place me on the Offender Register. I also understand that prior to any change of address, I am required to notify the local Probation and Parole office. I understand that I must register in any state in which I relocate, have employment, am a student or carry on a vocation until the expiration of my registration period. I further understand that I will be required to verify my address periodically with the Kentucky State Police in whatever form they deem appropriate and that my failure to comply with any portion of this law is a Class D felony.

Effective April 11, 2000, KRS 17.510(11) had been amended to increase the penalty for a violation of KRS 17.510 from a Class A misdemeanor to a Class D felony. 2000 Ky. Acts, ch. 401, § 16(11).

## II. THE MAY 2002 TRIAL.

On May 20 and 21, 2002, Appellant was tried by a Fulton Circuit Court jury on the sodomy 1st and PFO 1st charges contained in indictment number 01–CR–00015. The handgun charge was severed from the indictment for purposes of trial. RCr 9.16. Pursuant to KRE 404(c), the Commonwealth gave pretrial notice of its intent to introduce evidence pertaining to Appellant's prior sexual offense convictions during the guilt phase of the trial. The trial court ruled *in limine* that it would permit evidence pertaining to the 1995 convictions but not the 1989 convictions. As it turned out, the Commonwealth did not introduce any evidence pertaining to the 1995 convictions. Appellant's defense was a complete denial. He claimed that when he learned that the police had been to his home, he could not face Crumble and decided to commit suicide because he knew she had learned that he was a convicted felon and would leave him. He also claimed that when he told the police, "I did what they say I did," he was referring to his prior convictions. Further, Jawan Ghoulson testified as a defense witness that Crumble told him after Appellant's arrest that "[Appellant] didn't do it." A mistrial was declared when the jury was unable to reach a verdict.

On some unknown date after the mistrial, the grand jury rendered indictment number 02–CR–00122, charging Appellant with violating the Sex Offender Registration Act on May 23, 2002, two days after the mistrial of his sodomy/PFO trial. This time, unlike indictment number 01–CR–00088, the grand jury added a charge of PFO 1st. The significance of the date of May 23, 2002, is unknown. Appellant still resided in the Fulton County Jail on that date and had not changed his address since signing the new registry form on November 8, 2001.

## III. THE SEPTEMBER 2002 TRIAL.

### A. Sex Offender Registration Violation; Jurisdiction.

The second trial took place on September 10, 2002. Instead of retrying the sodomy and PFO charges contained in indictment number 01–CR–00015, the Commonwealth elected to consolidate the handgun charge in that indictment with the sex offense registration charge in indictment number 02–CR–00122 and try them together. Although indictment number 02–CR–00122 is not part of this record, the prosecutor and defense counsel referred to it on the morning of trial as a "superseding indictment." The trial court overruled Appellant's motion to dismiss that indictment on grounds that it charged an offense that was only a misdemeanor.

The Sex Offender Registration Act was enacted in 1994. 1994 Ky. Acts, ch. 392. It was amended in 1998 and 2000. 1998 Ky. Acts, ch. 606, §§ 138–154; 2000 Ky. Acts, ch. 401, §§ 15–30. The pertinent provisions of the 1994 Act, which was in effect when Appellant was released from prison on August 1, 1997, were as follows:

SECTION 1.

As used in Sections 1 to 5 of this Act:

. . . .

(4) "Sex crime" means a felony offense defined in KRS Chapter 510, KRS 530.020, 530.064, or 531.310, a felony attempt to commit a sex crime, or similar offenses in another jurisdiction.

. . . .

SECTION 2.

. . . .

(2) Beginning January 1, 1995, any person eighteen (18) years of age or older at the time of the offense who is re-

leased on . . . a final discharge from a penal institution for *committing or attempting to commit a sex crime* shall, within fourteen (14) days after his release, register with the local probation and parole office in the county in which he resides.

(3) Beginning January 1, 1995, any person who is discharged, paroled, or released on shock probation from a jail, prison, or other institution where he was confined because of the *commission or attempt to commit a sex crime* shall, prior to discharge, parole, or release, be informed of the duty to register under this section by the official in charge of the place of confinement. . . .

. . . .

(7) If the residence address of any registrant changes, the person shall register, within fourteen (14) days of the change of address, with the local probation and parole office in the county of the new residence. The local probation and parole office shall send this information to the Information Services Center, Kentucky State Police, Frankfort, Kentucky.

(8) Any person required to register under this section who violates any of the provisions of this section is guilty of a Class A misdemeanor.

. . . .

SECTION 3.

Persons required to register pursuant to the provisions of Section 2 of this Act shall remain registered for a period of ten (10) years . . . .

. . . .

SECTION 6.

The provisions of Sections 1 to 5 of this Act shall apply to persons convicted after the effective date of this Act.

1994 Ky. Acts, ch. 392 (emphasis added). The 1994 Act applied to Appellant because his 1995 convictions occurred after the effective date of the Act, which was July 15, 1994. As the emphasized language denotes, Appellant was required to register whether or not the victim of his 1995 sex crime was a minor.

The 2000 amendments to the Act, including the amendment to KRS 17.510(11) that increased the penalty for a violation of the Act to a Class D felony, specifically "shall apply to all persons who, *after the effective date of this Act,* are required under Section 16 of this Act to *become registrants,* as defined in Section 15 of this Act." 2000 Ky. Acts, ch. 401, § 37 (emphasis added). The effective date of the Act was April 11, 2000. Section 15(4) (KRS 17.500(4)) defines a "registrant" as a person eighteen years of age or older who has committed a sex crime, *or a criminal offense against a victim who is a minor;* or any person required to register under KRS 17.510(6) or (7) (out-of-state convictions and registrations), or a person who has been subjected to involuntary civil commitment as a sexually violent predator. Since KRS 17.510(2) requires the registrant to register "on or before the date of his or her release," the reference to "committed a sex crime" obviously means "convicted of a sex crime."

■ The Commonwealth asserts that the 2000 version of the Act, which increased the penalty for a violation to a Class D felony, applies to Appellant. In *Peterson v. Shake,* 120 S.W.3d 707 (Ky. 2003), we held that Section 37 of the 2000 Act is unambiguous and that the 2000 amendments could not be applied retroactively to a person who became a registrant in 1999 when the 1998 version of the Act was in effect. *Id.* at 709–10. Similarly, we now hold that the 2000 amendments can-

not be applied retroactively to a person who became a registrant in 1997 when the 1994 version of the Act was in effect. The offenses charged in indictments numbers 01–CR–00088 and 02–CR–00122 were misdemeanors.

 The district court has exclusive jurisdiction over misdemeanor charges, KRS 24A.110(1), unless a misdemeanor offense is joined in a felony indictment. RCr 6.18; *Keller v. Commonwealth*, 594 S.W.2d 589, 591–92 (Ky.1980). Neither of the two indictments for violation of the Sex Offender Registration Act was joined with a felony charge; thus, the Fulton Circuit Court was without jurisdiction to try them and should have remanded both to the Fulton District Court for disposition. *Peterson*, 120 S.W.3d at 710.

Our resolution of this issue obviates the necessity to address Appellant's claim that the trial court erroneously permitted the Commonwealth to amend indictment number 02–CR–00122 during the course of the trial to change the date of the offense from May 23, 2002, to June 27, 2001, the date of the offense charged in the superseded indictment.

### B. Improper Joinder.

 Appellant's objection to the consolidation of the sex offender registration charge with the handgun charge for purposes of trial was erroneously overruled. Consolidation of separate indictments for trial is permitted only if the offenses charged in those indictments could have been joined in a single indictment. RCr 9.12. Offenses can be joined in a single

indictment only if "the offenses are of the same or similar character or are based on the same acts or transactions connected together or constituting parts of a common scheme or plan." RCr 6.18. There is no similarity between the handgun offense and the sex offender registration offense. To convict Appellant of the handgun offense, it may (or may not) have been necessary to introduce both the 1995 and 1989 convictions. However, it was completely irrelevant and highly prejudicial to prove at Appellant's trial for possession of a handgun that Appellant was not only a convicted sexual offender but also that he had violated the Sex Offender Registration Act. The same can be said for the introduction at Appellant's trial for violating the Sex Offender Registration Act of evidence that he also violated the proscription against possession of a handgun by a convicted felon. It was also irrelevant and prejudicial to introduce the fact of Appellant's 1989 conviction during the guilt phase of the sexual offender registration trial, since the Sex Offender Registration Act did not apply to that conviction. Consolidation of these indictments for purposes of trial was error requiring a new trial of the handgun offense.

### C. Jury Issues.

 During the trial court's general voir dire of the entire jury panel, Appellant's new public defender learned that nineteen of the thirty-seven panel members had also been members of the panel that participated in the voir dire of the May 20, 2002, sodomy trial.[1] Appellant moved to strike the entire panel or, alter-

1. It is unclear how this occurred, since a citizen cannot be summoned for jury duty more than once within a twelve-month period. KRS 29A.080(2)(g); Admin. Proc. Ct. Justice, Part II § 8(2)(g). Perhaps the trial court simply impaneled one large petit jury per year and required only the number need-

ed to report for a particular trial. *But cf. Bartley v. Loyall*, 648 S.W.2d 873, 874–75 (Ky.App.1982) (reversible error to try to equalize the workload by calling the numbers of jurors who have participated in fewer cases before calling the numbers of jurors who have participated in more cases).

natively, to strike those jurors who had participated in the May 20th trial. The latter, of course, would have resulted in a continuance, since only eighteen jurors would have remained, whereas twenty-eight are required for a felony trial (twelve to try the case and sixteen for peremptory strikes, RCr 9.40). The trial court excused only those panel members who had actually served as jurors on the sodomy case or who had remained in the courtroom and listened to the evidence. The court also excused a juror whom it had previously excused from the sodomy trial because she had been sexually abused as a child.

The trial court had already "pulled" other members of the September panel who had asked to be excused for various reasons, e.g., one needed to farm, another had a dental appointment, another was emotionally upset about a family matter, etc., intending to seat those jurors only if there were less than the minimum of twenty-eight jurors remaining to complete voir dire.[2] The upshot was that after "pulling" those with hardships and excusing those who had actually heard the evidence in the sodomy trial, only twenty-six panel members remained. The trial court added the farmer and the person with the dental appointment in order to achieve the required number of twenty-eight jurors, which may explain the court's reluctance to grant any further strikes for cause.

Thus, every juror on the September 10th panel who had been present during the voir dire of the May 20th panel knew that Appellant was accused not only of possession of a handgun by a convicted felon but also of using it to forcibly sodomize a child under the age of twelve. At the conclusion of voir dire, sixteen of those jurors were among the remaining twenty-eight prospective jurors from which Appellant's jury was chosen. Despite using four of his eight peremptory strikes to excuse such jurors (and two more to excuse jurors who expressed doubts that they could be fair and impartial[3]), seven of the twelve jurors selected to try the handgun case had also participated in the voir dire of the sodomy case, including one juror whom Appellant's previous attorney had removed from the sodomy jury by peremptory strike. That juror became the foreperson of the September 10th jury.

In *Merriweather v. Commonwealth*, 99 S.W.3d 448 (Ky.2003), a burglary case, we held that the trial court did not commit reversible error by refusing to strike for cause six jurors who had participated in the voir dire of a previous, unrelated assault case against the defendant. *Id.* at 450–51. However, *Merriweather* is distinguishable from the case *sub judice* on several grounds. First, the two cases in *Merriweather* were unrelated. Here, the handgun charge was directly related to the sodomy charge and, in fact, had been indicted with and severed from the sodomy charge.[4] The trial court in *Merriweather*

2. Appellant did not object to this procedure.

3. One, the brother of the Fulton Chief of Police, stated that his relationship with his brother would cause him to give more weight to the testimony of a Fulton police officer than other witnesses. The other, a corrections officer who worked with sex offenders at the Fulton County Jail where Appellant was presently incarcerated, stated she was "not sure" that she could be fair and impartial. Appellant challenged both jurors for cause. The trial court overruled the challenges after "rehabilitating" each juror with the "magic question." *But see Montgomery v. Commonwealth*, 819 S.W.2d 713, 717–18 (Ky.1991). Since we are reversing this case for a new trial for other reasons, we need not address whether the jurors expressed sufficient bias to have required their excusal for cause.

4. No doubt, knowledge of the sodomy charge also enhanced the prejudice inherent in being tried as a sex offender registrant violator. However, we have already determined that it was error to try that charge in circuit court.

determined that the jurors had only vague recollections of the nature of the charge in the prior trial. Here, many of the jurors volunteered during the court's general voir dire of the entire panel that they recognized Appellant because of their participation in the prior trial. The trial court did not ask the jurors whether they recalled the nature of the prior charge but only whether they had stayed in the courtroom and heard the evidence presented at the prior trial. During the prosecutor's voir dire, he inquired whether any prospective juror had heard anything during the May 20th trial that would prevent that person from rendering a fair and impartial verdict in the September trial, and he received no response. Defense counsel did not inquire whether any of the jurors recalled the nature of the offense for which Appellant was tried on May 20th, no doubt because a positive response would have re-educated those who had forgotten. Finally, the defendant in *Merriweather* excused all six of the jurors in question by exercising peremptory strikes; thus, none actually served as jurors on his case. Here, even if Appellant had exercised all eight of his peremptory strikes against jurors who were present during the voir dire of his sodomy trial, at least three such jurors would have served on this jury.

Since no juror admitted to being actually biased by participating in the sodomy trial, the issue is whether such constituted implied bias. This case falls somewhere between *Merriweather* and *Miracle v. Commonwealth*, 646 S.W.2d 720 (Ky.1983), wherein we held it was reversible error to try the defendant before jurors who had been present when he previously entered a guilty plea that was subsequently withdrawn. *Id.* at 720. In *United States v. Dempsey*, 733 F.2d 392 (6th Cir.1984), sixteen members of the panel called to try the defendant's case had been members of the same panel from which jurors were

selected for the prior trial of his codefendant, and three had actually served on the jury that tried and convicted the codefendant. The trial court continued the trial until the following day and told the clerk to instruct only those jurors who were not on the codefendant's panel to report for jury duty. When the clerk mistakenly instructed eight jurors who had served on the codefendant's panel to return, the trial court withheld ("pulled") those eight jurors and none actually served on the defendant's case. The United States Court of Appeals for the Sixth Circuit concluded that no error occurred. *Id.* at 397. *Dempsey*, of course, is factually more akin to *Merriweather* than to the case *sub judice*.

We conclude that the jurors who participated in the voir dire at Appellant's sodomy trial and thereby learned that he used a handgun to forcibly sodomize a child under twelve years of age were impliedly biased and should have been excused from serving on the subsequent handgun trial. Unlike in *Merriweather* and *Dempsey*, three of those jurors actually served on the handgun trial, thus constituting reversible error requiring a new trial.

■ Appellant, who is African–American, also complains that the jury panel contained a disproportionate number of non-African-Americans. Specifically, whereas he claims that African–Americans comprise approximately twenty-five percent of the population of Fulton County, only three African–Americans were on the jury panel. However, Appellant did not offer any evidence of systematic exclusion. *Commonwealth v. McFerron*, 680 S.W.2d 924, 927 (Ky.1984). Mere use of raw population statistics is insufficient. *Ford v. Commonwealth*, 665 S.W.2d 304, 307 (Ky. 1983) (requiring standard mathematical analyses as well as population data that

accounts for jury eligibility in order to make out a prima facie case, based on population data, of systematic exclusion).

### D. Failure to Redact.

█ The Commonwealth admitted into evidence the judgments reflecting Appellant's 1989 convictions of sodomy 2nd and sexual abuse 1st and his 1995 convictions of three counts of sexual abuse 1st. The Commonwealth also sought to introduce a copy of the 1995 indictment, which charged three counts of sodomy 1st, two counts of rape 1st, and PFO 2nd. The trial court sustained Appellant's objection to the admission of the indictment but overruled Appellant's motion to redact from the 1995 judgment a recitation that the convictions of sexual abuse 1st were "amended from Sodomy I (3 counts), with Rape I (2 counts), and Persistent Felony Offender II being dismissed." Thus, the Commonwealth was able to inform the jury of the contents of the indictment even though the indictment, itself, was excluded. The Commonwealth also admitted into evidence the sex offender register entry form executed by Appellant on July 17, 1997, before his release from prison. The trial court also overruled Appellant's motion to redact from that form the notation: "Sexual abuse I with twelve year old daughter of live-in girl friend."

In *Perdue v. Commonwealth*, 916 S.W.2d 148 (Ky.1995), we held that it was reversible error to inform the jury during the sentencing phase of the trial that the defendant's prior conviction of manslaughter had been amended down from the charge of murder—even though the trial

court subsequently admonished the jury not to consider that fact. *Id.* at 164–65. It is far more prejudicial to introduce such evidence during the guilt phase of a trial. Of course, Appellant could have avoided the admission of either judgment by simply stipulating to the convictions. *Old Chief v. United States*, 519 U.S. 172, 190–91, 117 S.Ct. 644, 654–55, 136 L.Ed.2d 574 (1997) (where prior conviction was relevant only to prove the element of defendant's status as a convicted felon and defendant offered to stipulate to that fact, trial court abused discretion by permitting government to prove the nature of the offense over defendant's objection).[5] If Appellant could have avoided introduction of the judgment by stipulating that he was a convicted felon, clearly he was entitled to have redacted from the judgment information from which the jury could deduce that he committed far greater offenses than those of which he was convicted.

█ The notation in the 1997 sex offender registry form was also irrelevant and prejudicial. Under the 1994 version of the Sex Offender Registration Act, the age of the victim was not a factor. A person convicted of any sex crime was required to register. 1994 Ky. Acts, ch. 392, § 2(2). The age of the victim only became relevant when the 2000 amendments increased the duration of the registration requirement to life if the victim was a minor. 2000 Ky. Acts, ch. 401, § 17(2) (KRS 17.520(2)). Thus, the Commonwealth was not required to prove the age of the victim in order to establish that Appellant was a sex offender registrant. The notation was particularly

---

**5.** The same reasoning expressed in *Old Chief* underlies that provision of KRE 609 which precludes a party impeaching a witness with a prior conviction from proving the nature of the impeaching offense when the witness admits the conviction's existence. When the witness is the defendant, identifying the na-

ture of the underlying offense could have a prejudicial effect far greater than the mere impeachment value of the conviction—especially if the defendant is on trial for a similar or related offense. *See Commonwealth v. Richardson*, 674 S.W.2d 515, 517–18 (Ky. 1984).

prejudicial with respect to the handgun offense because, while the 1995 judgment did reflect the nature of those indicted offenses that had been reduced or dismissed, it did not reflect the age of the victim.

### E. Other Crimes, Wrongs, or Acts; KRE 404(b).

The Commonwealth did not serve a KRE 404(c) notice of its intent to introduce evidence of other crimes, wrongs, or acts under KRE 404(b). Appellant filed a motion *in limine* to exclude such evidence but obtained no ruling. Nevertheless, defense counsel registered a contemporaneous objection to the admission of the following evidence.

*1. Terroristic threatening 3rd; KRS 508.080(1)(a).*

The Commonwealth called the sodomy victim, A.H., to the stand for the purpose of establishing that she observed Appellant in possession of a handgun on January 20, 2001. However, the Commonwealth elicited from A.H. not only that she observed Appellant in possession of the brown-and-black-colored handgun, but also that he "said if I had told anyone, he was going to shoot me with it." The only evidence, other than a prior conviction, necessary to prove the offense of possession of a handgun by a convicted felon is that the defendant possessed a handgun, not that he threatened to shoot someone with it. Obviously, the evidence of the threat was irrelevant and was offered solely for its prejudicial effect.

*2. Possession of a firearm by a convicted felon; KRS 527.040(1).*

Wiley Pinson, a former officer of the Fulton Police Department, testified that he obtained from Appellant's wife a brown-and-black-colored Smith & Wesson .38 caliber revolver, as well as a silver Ruger .45 caliber pistol, a Stephens .16–gauge shotgun, and six .38 special bullets. When Appellant objected to the relevancy of the shotgun and bullets, the prosecutor responded that the indictment charged possession of a firearm by a convicted felon (Class D felony). Upon being advised that the indictment charged only possession of a handgun by a convicted felon (Class C felony), the prosecutor responded that the relevancy of the shotgun was that it was found in Appellant's residence. He did not explain the relevancy of the bullets. Of course, evidence that the shotgun was found in Appellant's residence was only relevant to prove that he possessed the shotgun—but the fact that he possessed the shotgun was irrelevant to prove the handgun charge. In addition to Pinson, Captain Ward, the former Fulton P.D. evidence custodian, and Officer David Townsend, the present evidence custodian, also identified and discussed the shotgun, which was marked and introduced into evidence. Captain Ward even handled the weapon, breaking it down in an ostensible attempt to find its serial number and pointing out to the jury that the weapon's stock was handmade.

*3. Sodomy; KRS 510.070.*

Captain Ward had prepared separate reports on the sodomy and handgun charges. For some reason, he brought both reports to the trial of the handgun offense. During direct and cross-examination, he testified only from his report describing the weapons obtained from Appellant's residence. On cross-examination, Appellant pointed out a discrepancy in the report. In attempting to rehabilitate the witness, the prosecutor asked Ward about another entry in his report. Ward responded: "That was the report on the handgun case. This is the report on the sodomy case." Appellant moved for a mistrial. The trial court overruled Appellant's mo-

tion and offered to admonish the jury not to consider Ward's reference to "the sodomy case." Appellant declined this offer on grounds it would only emphasize the point and further taint the jury.

Frankly, we fail to perceive how this jury could have been further tainted by an admonition—or how the avalanche of irrelevant and prejudicial evidence introduced in this case could have been cured by an admonition. Except for the factual details of the sodomy charge, the jury already knew everything it would have known if the handgun charge and sodomy charge had not been severed. At least three jurors knew before the trial began that Appellant was previously tried for sodomizing a child under the age of twelve. In case they had forgotten, they were reminded of that fact by Captain Ward's reference to "the sodomy case." They were also told in this trial that Appellant threatened to kill the child he was accused of sodomizing; that he was previously convicted of three counts of sexually abusing another child who was twelve years of age, but only after the indictment for perpetrating far more serious charges against that child was either amended or dismissed; and that he had another conviction of sodomy and sexual abuse for which he served no time in prison. They now also knew that in addition to possessing the only handgun that was proven by competent evidence, he also possessed a second handgun, a shotgun with a handmade stock, and six bullets.

### F. Spousal Privilege.

When the Commonwealth called Crystal Crumble as a witness, Appellant invoked the spousal privilege to preclude her from testifying against him about events occurring during the marriage, i.e., his possession of a handgun. The prosecutor proffered to the court that the privilege did not apply because Crumble would testify that her children were present when Appellant displayed the handguns to her, thus the communications were not confidential, citing *Ewing v. May*, 705 S.W.2d 910 (Ky. 1986), *Wadlington v. Sextet Mining Co.*, 878 S.W.2d 814 (Ky.App.1994), and *Commonwealth v. Byrd*, 689 S.W.2d 618 (Ky. App.1985). Those cases, however, were decided under former KRS 421.210(1), which was repealed and replaced by KRE 504 in 1992, long before the events giving rise to this issue took place. 1992 Ky. Acts, ch. 324, § 30. KRE 504(a) provides:

> Spousal testimony. The spouse of a party has a privilege to refuse to testify against the party as to events occurring after the date of their marriage. *A party has a privilege to prevent his or her spouse from testifying against the party as to events occurring after the date of their marriage.*

(Emphasis added.)

Appellant's motion to exclude Crumble's testimony was overruled. In fact, Crumble testified that none of her children were present on those occasions when Appellant displayed the weapons to her. The trial court was on the verge of granting Appellant's motion for a mistrial when the prosecutor proffered that he could prove that Appellant displayed the weapons to Crumble before their marriage. Crumble then testified that Appellant showed her the brown-and-black-colored revolver before they were married but that he did not show her the silver pistol or the shotgun until after the marriage. The trial court then overruled the motion for a mistrial and admonished the jury to "disregard all evidence you have heard about the .45 automatic and the shotgun and they are stricken from the evidence." By that point, four witnesses had testified that the .45 caliber pistol and the shotgun were found in Appellant's residence. In light of

all of the other unfairly prejudicial evidence admitted in this case, we conclude that the trial court's admonition to disregard "all evidence" about the .45 pistol and the shotgun did not "unring the bell." *Foster v. Commonwealth,* 827 S.W.2d 670, 683 (Ky.1991) ("We suspect here that before the penalty phase was very many hours old, the court and the attorneys came to the grim realization that it was too late to 'unring the bell' and that any death penalty verdicts returned by the jury would only be ephemeral in duration."). Likewise, after admonishing the jury to disregard the evidence pertaining to the pistol and the shotgun, the trial court in the case *sub judice* told the prosecutor: "This one's coming back."

Appellant's defense to the handgun charge was that the brown-and-black-colored revolver belonged to Crumble and that she obtained it in order to protect herself and her children while he was working at night, a defense that might have seemed more plausible had the jury not known that a second handgun and a shotgun were also found in the residence—presumably what the prosecutor meant when he explained that the shotgun was relevant because it was found in the residence. At the conclusion of the evidence, the jury rendered verdicts finding Appellant guilty of both the handgun and sex offender registry charges and fixed his sentences for those offenses at the maximum of ten years and five years, respectively.

The Commonwealth dismissed the PFO charge, presumably because the 1995 conviction, which had been used to prove Appellant's status as a convicted felon, could not be re-used to enhance his penalty for the handgun offense, *Boulder v. Commonwealth,* 610 S.W.2d 615, 617–18 (Ky.1980), *overruled on other grounds by Dale v. Commonwealth,* 715 S.W.2d 227, 228 (Ky.

1986); and the 1989 offense, standing alone, did not qualify as a PFO enhancer under KRS 532.080(2)(c)1. Although it is not reflected in this record, Appellant states in his brief that the trial court subsequently merged indictment numbers 01–CR–00088 and 02–CR–00122, and then dismissed 02–CR–00122, leaving the posture of the case as if Appellant had been tried and convicted under 01–CR–00088, which explains why Appellant appealed a conviction under an indictment for which he was never tried.

## IV. THE MARCH 2003 TRIAL.

### A. Prior Convictions.

The retrial of the sodomy and PFO 1st charges began on March 14, 2003. Again, the Commonwealth gave notice pursuant to KRE 404(c) of its intent to introduce during the guilt phase evidence pertaining to Appellant's 1989 and 1995 convictions. The nature of the intended evidence was not revealed, as the Commonwealth merely attached copies of the prior convictions to its motion. Appellant's new (third) attorney filed a written motion *in limine* to suppress the evidence on grounds that the evidence did not satisfy any of the "other purpose(s)" of KRE 404(b). Although the trial court had sustained Appellant's motion *in limine* to suppress evidence of the 1989 conviction at the May 2002 trial, it overruled the *in limine* motion with respect to both prior offenses at the March 2003 trial.

### 1. Law of the Case.

Appellant contends that the trial court's exclusion of evidence pertaining to the 1989 conviction at the May 2002 trial was the "law of the case" precluding its admission at the March 2003 trial. As applied in Kentucky, the law of the case doctrine applies only to rulings by an appellate court and not to rulings by a trial

court. *Scamahorne v. Commonwealth*, 376 S.W.2d 686, 687–88 (Ky.1964). *See also United States v. Akers*, 702 F.2d 1145, 1147–48 (D.C.Cir.1983). While some courts take a more liberal view of the doctrine and have applied it to trial court rulings, *see e.g., United States v. Alexander*, 106 F.3d 874, 876–77 (9th Cir.1997), we decline to join them.

*2. Preservation.*

■ When the prosecutor began discussing the prior offenses during opening statement, defense counsel approached the bench and made the following statement:

Judge, I would like a running objection as to any prior acts in this case and an objection that would follow throughout this whole trial so I won't have to make an objection again; but I object to *any evidence* of any prior bad acts on the part of Mr. Dickerson.

(Emphasis added.)

After obtaining reconfirmation from the prosecutor that the evidence would show a modus operandi, the trial court said to defense counsel, "Okay, all right," by which we assume he granted defense counsel a continuing objection.

The prosecutor did not elicit evidence pertaining to the 1995 conviction from the victim or anyone else with personal knowledge of the facts of that case. Instead, former Fulton Police Captain John Ward began reading from an unidentified document in his file. He read that the allegations involved sexual acts perpetrated against C.B. during the period from 1992 to 1995; that C.B. was over twelve years of age in 1995; that C.B. was the daughter of Appellant's girlfriend; that the acts occurred in the bedroom of the home while C.B.'s mother was at work; and that the acts "involved an allegation of sodomy." There was no factual description of the alleged act of sodomy. Specifically, there

was no evidence that Appellant licked C.B.'s vagina, that he placed his penis against, but did not penetrate, C.B.'s anus, or that he ejaculated on her anus. There was also no evidence that Appellant flourished a weapon or threatened to harm C.B. if she did not comply with his wishes. Ward did not testify that he was reading from a public record or from any record that had been prepared by him or that was in his custody or control. Since the 1995 conviction was premised upon offenses occurring in Jefferson County, it is likely that he was reading from an investigative report or summary prepared by a Jefferson County police agency. Defense counsel did not object to this obvious hearsay, apparently believing that the trial court's grant of a continuing objection to "any evidence" of prior bad acts sufficed to preserve the issue.

■ Unlike its federal counterpart, KRE 103(a)(1) does not require a party objecting to evidence to state the grounds for the objection, except upon request of the court. Robert G. Lawson, *The Kentucky Evidence Law Handbook* § 1.10[4][b], at 38–39 (4th ed. LexisNexis 2003). Continuing objections are appropriate when the claim of error is that the witness is incompetent to testify to anything, *e.g.*, that the testimony violates the marital privilege; that out-of-court statements of the same declarant violate the hearsay rule; or that the same irrelevant evidence is inadmissible when repeated by different witnesses. *Davis v. Commonwealth*, 147 S.W.3d 709, 721 (Ky.2004). Appellant's continuing objection was obviously premised upon the denial of his motion *in limine* to exclude evidence pertaining to the prior convictions pursuant to KRE 404(b), not to exclude hearsay pursuant to KRE 802. The continuing objection did not preserve the hearsay issue.

*3. KRE 404(b); Modus Operandi.*

In addition to the evidence pertaining to the 1995 convictions, the Commonwealth presented the testimony of L.A., the victim of the 1989 convictions. L.A. testified that she was fourteen years old in 1988 and that Appellant's sexual activity with her had gone on "for some time" before the indictment was rendered. The activity usually occurred while her mother was at work or asleep, and Appellant told her that if she ever told anyone, he would kill her and her mother. When asked if Appellant had any weapons, L.A. responded that he had a machete and a sword. She did not testify that he threatened her with a firearm (or with the machete or sword). With respect to the facts of the sexual offenses, her entire testimony was as follows:

Q. Did something occur in 1988 or before 1988 that resulted in a criminal prosecution in Louisville against Mr. Dickerson?

A. Yes.

Q. Did it involve acts of a sexual nature?

A. Yes.

Q. What if any part of those acts involved what the law calls sodomy— touching of his private areas with your private areas?

A. (No response.)

Q. These sexual acts, did they involve sodomy?

A. Yes.

Q. Do you understand what I mean by sodomy, the touching of your rear end, anus, with his private area or the touching of your frontal area with his mouth?

A. Yes.

Thus, L.A. was not asked and did not testify to any facts constituting the sexual offenses perpetrated against her other than that they "involved sodomy." Specifi-cally, she did not testify that Appellant licked her vagina, placed his penis against, but did not penetrate, her anus, or that he ejaculated on her anus. Although she testified to threats, she did not testify that Appellant threatened her with a gun (or even a machete or a sword) to induce her to accede to his wishes. Although she testified that her mother was either at work or asleep when the acts occurred, she did not testify as to where the acts occurred.

KRE 404(b) first provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the *character* of a person in order to show action in conformity therewith." (Emphasis added.) Thus, we have held that evidence of prior sexual misconduct is inadmissible if it proves only a "lustful inclination." *Pendleton v. Commonwealth*, 685 S.W.2d 549, 552 (Ky.1985). However, KRE 404(b)(1) permits the admission of such evidence "[i]f offered for some other purpose, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." This list of "other purpose[s]" is illustrative rather than exhaustive. *Tamme v. Commonwealth*, 973 S.W.2d 13, 29 (Ky.1998). Here, the evidence was offered to prove the corpus delicti, *i.e.*, that the offense, in fact, occurred, by demonstrating a modus operandi. We first discussed the degree of similarity necessary to demonstrate a modus operandi in the pre-Rules case of *Adcock v. Commonwealth*, 702 S.W.2d 440 (Ky. 1986):

In every case in which evidence of other crimes is sought to be introduced to establish a pattern or scheme, the real question is whether the *method of the commission of the other crime or crimes is so similar and so unique as to indicate a reasonable probability that the*

*crimes were committed by the same person.*

*Id.* at 443 (emphasis added).

In *Billings v. Commonwealth,* 843 S.W.2d 890 (Ky.1992), we discussed at length the degree of similarity necessary to indicate a reasonable probability that sexual crimes were committed by the same person so as prove the corpus delicti by demonstrating a modus operandi.

> In the present case—as in many involving charges of sexual crimes—the ascendant issue is the corpus delicti— whether the event occurred at all. And on this issue is the application of the evidentiary rules most problematic. Unless the collateral act has some direct relationship to the charged act, the inference that the charged act occurred is necessarily founded on nothing more than the defendant's character and predisposition as revealed by the collateral act.
>
> In cases of this nature, we have long recognized that the degree of similarity between the charged and the uncharged acts is a critical factor in establishing a direct relationship independent of character. *As the degree of similarity increases, and a modus operandi appears, inferences are more likely to be drawn from the events' common facts rather than their common criminality.*
>
> . . . .
>
> *The conclusion must be that two acts involving sexual crimes are not necessarily "similar."* . . . [B]ad acts evidence offered to prove the corpus delicti by similarity should meet the same criteria as such evidence offered to prove identity by similarity—that is, it should indicate a modus operandi.
>
> . . . .
>
> While the issue of the corpus delicti is primary in these cases, identity of the perpetrator (if any) is not wholly irrelevant. It seems more accurate to say that the latter issue is assimilated into the former. If the act occurred, then the defendant almost certainly was the perpetrator. The two issues are essentially integrated. It is entirely appropriate, we believe, for purposes of assessing the admissibility of evidence of collateral crimes in the present context, to treat the evidence as if offered to prove identity by similarity, *and to require that the details of the charged and uncharged acts be sufficiently similar as to demonstrate a modus operandi.*

*Id.* at 892–93 (footnote omitted).

■■■ Thus, it is not the commonality of the crimes but the commonality of the facts constituting the crimes that demonstrates a modus operandi. Although it is not required that the facts be identical in all respects, "evidence of other acts of sexual deviance . . . must be so similar to the crime on trial as to constitute a so-called signature crime." *Rearick v. Commonwealth,* 858 S.W.2d 185, 187 (Ky.1993).

Mere evidence that Appellant had previously sodomized C.B. and L.A. proved only a commonality of the crimes and established only Appellant's lustful inclination toward sodomizing females of that age group. No facts were introduced to describe the nature of the acts of sodomy that Appellant perpetrated against C.B. or L.A.—only the conclusory testimony that whatever he did was sodomy. While there was evidence that he sodomized C.B. "in the bedroom while her mother was at work," there was no evidence that he threatened her with bodily harm if she did not accede to his advances. While there was evidence that he threatened to harm L.A. and that the sexual abuse sometimes occurred when her mother was at work (but also sometimes when her mother was asleep at home), there was no evidence

indicating where the sodomy occurred and no evidence that Appellant used a firearm. Reiterating that the facts need not be identical in all respects, there was an insufficient commonality of facts in these cases to prove a "signature crime" demonstrating a modus operandi in order to prove that Appellant committed the present offense.

This is not to say that there was insufficient evidence to convict Appellant of sodomizing A.H. A.H.'s testimony alone was sufficient to support his conviction. Nor are we saying that the Commonwealth could not present more detailed evidence of Appellant's prior sexual misconduct upon retrial that would meet the standard established by *Adcock, Billings,* and *Rearick.* We hold only that the evidence presented at the March 2003 trial was insufficient to prove a modus operandi and, thus, proved only Appellant's lustful inclination, requiring reversal for a new trial.

### B. Denial of Right to Present Defense.

During one of the bench conferences, defense counsel advised the trial court that he had been unable to serve a subpoena on Jawan Ghoulson, who had testified at the May 2002 trial that Crumble told him that "[Appellant] didn't do it," and defense counsel asked permission to read to the jury a transcript of Ghoulson's previous testimony. Instead, the trial court directed defense counsel to give the subpoena to the sheriff and directed the sheriff to attempt to serve it on Ghoulson before the conclusion of the trial. Later in the day, the sheriff advised the court that he had been unable to locate Ghoulson. The trial court found Ghoulson to be "unavailable as a witness," as defined in KRE 804(a)(5), and indicated that defense counsel could read his prior testimony. The prosecutor then objected on grounds that the transcript was improperly authenticated, be-

cause the certificate of the notary public who had transcribed the testimony from the official videotape read:

> I, Kimberly Boyd, Notary Public in and for the State of Kentucky at Large, do hereby certify that the foregoing jury trial testimony in *Commonwealth v. Dickerson* has been transcribed by me to the best of my ability this the 8th day of August, 2002.

The trial court reconsidered its ruling and sustained the objection, apparently because CR 30.06(1) requires that the officer taking a deposition "shall certify on the deposition that the witness was duly sworn by him and that the deposition is a true record of the testimony given by the witness." Defense counsel introduced the transcript by way of avowal. KRE 103(a)(2). For some reason, defense counsel did not request to play the official videotape of Ghoulson's prior testimony to the jury. Regardless, the March 2003 jury never heard Ghoulson's May 2002 testimony that Crumble told him that "[Appellant] didn't do it."

Civil Rule 30.06(1) applies to a person who places the witness under oath and creates a record of the witness's oral testimony as it is given. That is how a transcript of prior testimony would have been produced prior to our adoption of video recording as the official record. There was no court reporter present at the May 2002 trial who could have prepared an official transcript of that trial. The transcript offered by Appellant did not purport to be "official" or even a public record. Thus, the applicable rule with respect to the authentication of that transcript is KRE 901(a), *i.e.*, that authentication or identification "is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." The answer to this issue is succinctly stat-

ed in *Bruce v. Commonwealth,* 441 S.W.2d 435 (Ky.1969):

> Appellant also contends that the testimony read was not duly authenticated, as required by RCr 7.22. We think this objection is without merit since no contention is made that the testimony read was not the testimony actually given by this witness at the former trial . . . .

*Id.* at 437–38.

 Likewise, the prosecutor (who participated in both trials) did not claim that the transcript was inaccurate. Ghoulson's defense testimony lasted seven minutes and the transcript consists of fewer than six typewritten pages. We have compared the transcript with the official videotape and have found that the only discrepancy occurred when the notary, in transcribing defense counsel's statement to the trial court that he intended "to introduce a prior inconsistent statement of Ms. Crumble's," substituted "existing" for "inconsistent." Otherwise, the transcript is accurate.

> The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations. This right, often termed the "right to present a defense," is firmly ingrained in Kentucky jurisprudence, and has been recognized repeatedly by the United States Supreme Court. An exclusion of evidence will almost invariably be declared unconstitutional when it significantly undermines fundamental elements of the defendant's defense.

*Beaty v. Commonwealth,* 125 S.W.3d 196, 206–07 (Ky.2003) (internal citations and quotations omitted). "It is crucial to a defendant's fundamental right to due process that he be allowed to develop and present any exculpatory evidence in his own defense, and we reject any alternative that would imperil that right." *McGregor*

*v. Hines,* 995 S.W.2d 384, 388 (Ky.1999). "A trial court may only infringe upon this right when the defense theory is unsupported, speculative, and far-fetched and could thereby confuse or mislead the jury." *Beaty,* 125 S.W.3d at 207 (internal citation and quotation omitted). Appellant's sole defense to the sodomy charge was that he did not commit the offense. Ghoulson's testimony with respect to Crumble's prior inconsistent statement was the only evidence other than Appellant's own testimony that proved his defense. If the facts are the same upon retrial, *i.e.,* if Ghoulson is an "unavailable witness" as defined in KRE 804(a)(5), Appellant shall be permitted to either read the transcript of his testimony at the May 2002 trial or play the videotape of that testimony to the jury.

### C. Unpreserved Claims of Evidentiary Error.

 Appellant also complains of the admission of evidence pertaining to the emotional impact of the crime on A.H., *i.e.,* that her mother took her to a rape crisis center for treatment, and evidence offered by several witnesses that A.H. repeated her version of the events several times and that the witnesses perceived no inconsistencies in her statements. There were no contemporaneous objections to any of this testimony; thus, this issue is not preserved for appellate review. KRE 103(a)(1). Nor did the admission of this testimony constitute manifest injustice. KRE 103(e). However, we will address these issues because they are likely to recur upon retrial.

#### 1. Evidence of victim's emotional injury.

 The evidence of A.H.'s emotional injury was directly relevant to prove that she was sexually assaulted, an element of the Commonwealth's case-in-chief. The

evidence became even more relevant when Appellant denied that the assault occurred. We reject Appellant's assertion that this evidence was inadmissible as indirect evidence of Sexual Abuse Accommodation Syndrome. Although this is an issue of first impression in Kentucky, other jurisdictions have permitted evidence of a victim's emotional state following a sexual assault as proof that the assault, in fact, occurred. *See, e.g., Simmons v. State,* 504 N.E.2d 575, 581 (Ind.1987) (trial court did not abuse discretion in admitting testimony from family members that following rape, victim became afraid to go outside by herself, stayed at home more often, and feared for family members who went out alone, concluding that it was probative of fact that victim had been raped); *State v. Bishop,* 240 Kan. 647, 732 P.2d 765, 774 (1987) (victim's testimony that she received counseling as a result of being raped was circumstantial evidence that she had been raped); *State v. Dube,* 598 A.2d 742, 746 (Me.1991) ("Evidence of changes in the victim's personality and behavior immediately after the time of the reported assault tends to prove that something of a traumatic nature had in fact occurred and thus was clearly relevant to the State's case."); *Parker v. State,* 156 Md.App. 252, 846 A.2d 485, 497–98 (2004) (jury could legitimately infer that victim's behavior changed due to rape from the fact that "abrupt behavioral change[s] occurred closely on the heels of the rape"); *State v. Seiter,* 949 S.W.2d 218, 223 (Mo.Ct.App.1997) (experts and laymen can testify about their observations concerning physical and psychological changes in the victim because such evidence helps to prove the elements of the sexual offense, itself, and thus may be admitted to show the offense did, in fact, occur); *State v. Cosey,* 873 P.2d 1177, 1181–82 (Utah Ct.App.1994) (testimony of victim's mother contrasting victim's behavior prior to the incident with that after the incident was

properly admitted as "relevant circumstantial evidence that a traumatic experience such as rape has occurred"); *State v. Shaw,* 149 Vt. 275, 542 A.2d 1106, 1107–08 (1987) (evidence of changes in the complainant's personality was material to the key question of whether a sexual assault occurred). We agree with these other courts and hold that evidence that A.H. visited a rape crisis center for treatment was relevant to prove that she was sexually assaulted.

*2. Evidence of victim's prior consistent statements.*

It is improper to permit a witness to testify that another witness has made prior consistent statements, absent an express or implied charge against the declarant of recent fabrication or improper influence. KRE 801A(a)(2). Otherwise, the witness is simply vouching for the truthfulness of the declarant's statement, which we have held to be reversible error. *Bussey v. Commonwealth,* 797 S.W.2d 483, 484–85 (Ky.1990). *See also LaMastus v. Commonwealth,* 878 S.W.2d 32, 34 (Ky. App.1994). We perceive no conceptual distinction between testimony that repeats the witness's prior consistent statement verbatim and testimony that the witness previously made statements that were consistent with her trial testimony. Either way, the evidence is offered to prove that the declarant's trial testimony is truthful because it is consistent with her prior statements. "A witness cannot be corroborated by proof that on previous occasions he has made the same statements as those made in his testimony." *Smith v. Commonwealth,* 920 S.W.2d 514, 517 (Ky.1995).

*D. Claims of Penalty Phase Error.*

*1. Prior convictions.*

During the penalty phase of the March 2003 trial, the trial court made the same

error it made in the guilt phase of the September 2002 trial when it permitted the clerk to read from the 1995 judgment of conviction that the offenses of which Appellant was convicted were "amended from Sodomy I (3 counts), with Rape I (2 counts), and Persistent Felony Offender II being dismissed." *See Perdue*, 916 S.W.2d at 164–65 (holding that the trial court committed reversible error in failing to grant a mistrial after the jury was informed, during the penalty phase, that the defendant's prior manslaughter conviction had resulted from an amendment of murder charges). Although this issue was not preserved by contemporaneous objection, we have addressed it because it is likely to recur upon retrial.

Appellant did object to the prior convictions on grounds that they were improperly authenticated because there was no acknowledgment, as required by KRE 902(8). However, each conviction contains a certificate, which purports to be signed by a deputy clerk of the Jefferson Circuit Court, that it is a "certified copy of records of Jefferson Circuit Court, Tony Miller, Clerk." That suffices to satisfy the authentication requirements of KRE 902(2).

*2. Proof of PFO Status.*

■ Joe Morris, a probation and parole officer employed by the Department of Corrections (D.O.C.), testified from D.O.C. records that Appellant was released from prison on August 1, 1997, less than five years prior to the commission of the present offense. *See* KRS 532.080(2)(c)1 (providing that PFO status can be imposed for a previous felony conviction for which the offender completed service of the sentence within five years prior to the commission of the present felony). Appellant objected to Morris's testimony on grounds that he was not the custodian of the records and could not authenticate their accuracy. However,

D.O.C. records are public records, not business records; thus the Commonwealth was not required to introduce them through a "custodian or other qualified witness." *Compare* KRE 803(8) (public records) *with* KRE 803(6) (business records). Morris, an employee of the agency entrusted with custody of the records, testified from his knowledge that they were D.O.C., *i.e.*, public, records. The trial court obviously believed that "the source[ ] of information," *i.e.*, Morris, did not "indicate lack of trustworthiness." KRE 803(8). The records were properly admitted.

Accordingly, the judgments of conviction and sentences imposed by the Fulton Circuit Court are reversed and this case is remanded to that court for further proceedings consistent with the content of this opinion.

LAMBERT, C.J.; GRAVES, and JOHNSTONE, JJ., concur.

ROACH, J., concurs by separate opinion.

SCOTT, J., concurs in part and dissents in part by separate opinion.

WINTERSHEIMER, J., dissents without separate opinion.

Concurring opinion by Justice ROACH.

As to Appellant's May 2002 trial, I join Parts III.A., III.B., III.D., III.E. and III.F. of the majority opinion. However, because there is no likelihood that the jury issues, as discussed in Part III.C., will be present at retrial, I do not believe that we should address them. *See Ice v. Commonwealth*, 667 S.W.2d 671, 680 (Ky.1984) ("Since we have reversed this case for the reasons previously given, we will not discuss the other points raised by appellant inasmuch as they are unlikely to recur on retrial of this case."); *Terry v. Common-*

474

*wealth,* 153 S.W.3d 794, 797 (Ky.2005) ("We will also address other issues that are likely to recur upon retrial.").

As to the March 2003 trial, I join Parts IV.B., IV.C. and IV.D. of the majority opinion. I concur in result only as to Part IV.A.

Opinion by Justice SCOTT, Concurring in Part and Dissenting in Part.

I concur with all of Justice Cooper's opinion except issue IV.A.2, in regards to the "continuing objection."

The granting of such objections is controlled by the trial courts and is used to avoid repetitive interruptions. They are a useful tool and should be upheld when granted. Otherwise, their use will become so fraught with the "danger of waiver," that trial attorney's will avoid their use. One, who has sat through trials with repetitive objection after repetitive objection, knows how damaging they can be to a party and how irritating it can be to the court—and the jury. It's not something one should do and this is the reason for asking for, and getting a "continuing objection." The continuing objection granted in this case served its purpose and should be upheld so as to preserve its intended function—which in this case was to object to any evidence (hearsay or otherwise) pertaining to the prior convictions.